| Fill in this information to identify the case: |
|---|
| Debtor Name:  CAMP RIM ROCK, LLC |
| United States Bankruptcy Court for the Eastern District of Pennsylvania |
| Case number: 24-11498 (AMC) |

___ Check if this is an amended filing

Official Form 425A

# Plan of Reorganization for Small Business Under Chapter 11     02/20

## Camp Rim Rock, LLC's Plan of Reorganization, dated July 31, 2024 (the "Plan")

### Background for Case Filed Under Subchapter V

**A. Description and History of the Debtor**

The Debtor owns and operates an overnight camp in Yellow Spring, West Virginia for girls from ages 6 to 15.  The camp has been in business since 1952 (and under its current ownership since 2004) and offers a wide array of outdoor and indoor activities, including horseback riding, aquatics, performing arts and a variety of other sports and activities.

The camp is situated over three separately parceled, but adjacent, properties comprising nearly 500 acres in total (the "Properties"). The main property, which consists of approximately 136 acres, is where all camp functions occur.  It consists of 40 cabins, three single-family homes, barns, pavilions, a full dining facility, two outdoor pools and a variety of fields and other camping attributes.

The other two parcels each consist of approximately 148 acres and 181 acres and are separated from the main parcel by a relatively shallow waterway.  These Properties are used primarily as horseback riding trails and to house horses during the offseason.

The bulk of the Debtor's income is generated during its summer season, which begins in the middle of June and ends in the middle of August of each calendar year.  Specifically, the Debtor first runs a one-week session for horseback riding, then 3 two-week overnight camper sessions (although campers can elect up to four weeks total) and then concludes with a single week of horseback riding.  The Debtor also supplements its income through group events that are booked on dates outside of the foregoing season.

The Debtor filed a prior chapter 11 voluntary petition on January 19, 2020 in this Court at case number 20-14692 (the "First Bankruptcy Case"), due in large part to the Covid-19 pandemic causing a sharp downturn in 2020 summer camp enrollment.  The First Bankruptcy Case resulted in a confirmed Plan of Reorganization (the "First Plan"), and a final decree was entered on November 15, 2023.

The Debtor's principal secured lender is The Dime Bank ("Dime Bank"), which holds a first-priority mortgage debt (the "Senior Secured Debt") secured by the Camp's Properties.  The First Plan contemplated ongoing monthly payments of $12,265.30 to Dime Bank on account of principal, interest, and real estate tax escrow, with full payment occurring by November 17, 2023 through any means, including investment, sale, finance, or refinance.  The Debtor remained current on its monthly payment obligations but was unable to timely close on a refinance of the Senior Secured Debt, and Dime Bank sought to sell the Debtor's real property at a foreclosure sale on May 2, 2024.

The Debtor filed the instant chapter 11 case on May 2, 2024 (the "Petition Date") to prevent the financial and logistical havoc that an involuntary sale of its property would have certainly caused.  On the Petition Date, the Debtor had already made significant preparations for the summer 2024 season.  Many campers had already paid deposits for attendance at the summer 2024 season,

which funds the camp had already expended in preparatory costs. The camp had also already employed its summer staff, who were expecting gainful employment through the summer.

Accordingly, the Debtor had no realistic choice but to file a second chapter 11 case to preserve its real property and continue operations this summer. Through this second bankruptcy case, the Debtor plans to address its liabilities, including its Senior Secured Debt and otherwise reorganize its affairs.

Pursuant to 11 U.S.C. § 1191, the Debtor intends to fund its Plan payments from its disposable income, but reserves the right to sell some or all of the Properties, as more fully described in Subpart C below.

**B. Liquidation Analysis**

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation. A Liquidation Analysis is appended to this Plan as Exhibit A. As shown therein, the value of the Debtor's real and personal property totals $3,690,603.15. After deducting the amounts payable on account of secured claims and the administrative expenses of a hypothetical chapter 7 case, the amount available for distribution to general unsecured creditors in a chapter 7 liquidation would be $641,791.84. Accordingly, as more fully set forth herein, general unsecured creditors are receiving in the aggregate $997,032, which is materially more than they would receive in a chapter 7 liquidation.

**C. Ability to make future plan payments and operate without further reorganization**

The Debtor must also show that it will have enough cash over the life of the Plan to make the required Plan payments and operate its business.

The Debtor has provided projected financial information as attached Exhibit B (the "Projections"). The "Effective Date" (as defined in Section 8.02 below) of the Plan shall be the later of either November 1, 2024 or the first business day that is at least 15 days following entry of a confirmation order by the Court. These projections consist of a cash flow from the anticipated Effective Date of the Plan (November 1, 2024) through April 2029. The Debtor has selected April 2029 as the last month of the Plan because May 2029 is the five-year anniversary of the Petition Date, and the Debtor's priority tax claims must be paid within five years of the Petition Date under 11 U.S.C. 1129(a)(9)(C).

The final Plan payment is expected to be paid in May 2029.

*You should consult with your accountant or other financial advisor if you have any questions pertaining to these projections.*

# Article 1: Summary

This Plan under chapter 11 of the Bankruptcy Code (the "Code") proposes to pay creditors of the Debtor from disposable income as more fully set forth in this Plan.

This Plan provides for:
- 1 class of priority claims;
- 3 classes of secured claims;
- 1 class of non-priority unsecured claims; and
- 1 class of equity security holders.

Non-priority unsecured creditors holding allowed claims will receive distributions, which the proponent of this Plan has valued at approximately 29 cents on the dollar. This Plan also provides for the payment in full of administrative and priority claims.

All creditors and equity security holders should refer to Articles 3 through 7 of this Plan for information regarding the precise treatment of their claim. Your rights may be affected. You should read these papers

carefully and discuss them with your attorney, if you have one. (If you do not have an attorney, you may wish to consult one.)

## Article 2: Classification of Claims and Interests

| | | |
|---|---|---|
| 2.01 | **Class 1** .................................. | Class 1 consists of the camper deposit claims entitled to priority under § 507(a)(7) of the Code. |
| 2.02 | **Class 2** .................................. | Class 2 consists of the following claims, to the extent allowed as a secured claim under § 506 of the Code: |
| | | Class 2A consists of the allowed secured claim of The Dime Bank ("Dime Bank"), which is secured by its liens on, and security interest in, all assets of the Debtor pursuant to a loan dated April 17, 2012 in the original principal amount of $1,300,000. |
| | | Class 2B consists of the allowed secured claim of Kubota Credit Corporation ("Kubota"), which is secured by its lien on a tractor and related parts thereto pursuant to a certain Retail Installment Contract dated on or about October 2, 2019. |
| | | Class 2C consists of the allowed secured claim of Malcolm Road Associates Limited Partnership ("Malcolm Road"), which is secured by its lien on the Debtor's real property under a loan dated on or about July 24, 2019 in the face amount of $230,000.00. |
| 2.03 | **Class 3** .................................. | Class 3 consists of all non-priority unsecured claims allowed under § 502 of the Code. |
| 2.04 | **Class 4** .................................. | Equity interests of the Debtor. |

## Article 3: Treatment of Administrative Expense Claims, Priority Tax Claims, and Quarterly and Court Fees

| | | |
|---|---|---|
| 3.01 | **Unclassified claims** | Under § 1123(a)(1), Administrative Expense Claims and Priority Tax Claims, all as defined in Sections 3.02 and 3.03, respectively, are not in classes. |
| 3.02 | **Administrative expense claims** | "Administrative Expense Claims" shall consist of the allowed claims of the Debtor's court-employed professionals, along with the Subchapter V Trustee.  The Debtor estimates that the aggregate amount of allowed administrative expense claims will not exceed $66,000.  Each holder of an administrative expense claim allowed under § 503 of the Code will be paid pro rata from the Debtor's Disposable Income based upon their claims as allowed by this Court starting in the month of the Effective Date of the Plan and continuing each month thereafter until paid in full.  As projected, |

| | |
|---|---|
| | the Debtor believes that all Administrative Expense Claims shall be paid in full in monthly payments by October 2025. |
| 3.03 **Priority tax claims** | The Debtor has four creditors holding tax claims entitled to priority under 11 U.S.C. § 507(a)(8) ("Priority Tax Claims"): (1) West Virginia State Tax Department; (2) the Sheriff & Treasurer of Hampshire County; (3) Internal Revenue Service; and (4) WorkForce West Virginia (collectively, the "Taxing Authorities"). |
| | All allowed Priority Tax Claims (which shall include the secured claim, if any, of any such Taxing Authority) shall be paid by the Debtor, in cash, in an amount equal to such allowed priority tax claim, plus interest at a rate of 8% per annum, in equal monthly installments commencing in the month of the Effective Date and continuing through April 2029, or as otherwise agreed by the Taxing Authority, pursuant to Code Section 1129(a)(9)(C). |
| | Each holder of a Priority Tax Claim that has an allowed secured claim shall retain its liens on the Debtor's property to the same extent, priority and validity as it held as of the Petition Date; provided, however, that all payments received by such taxing authority shall be applied first to its secured claims and then towards its Priority Tax Claims from the oldest in time to the most recent. If and as a secured claim is paid in full, the applicable Taxing Authority shall promptly mark its lien satisfied. |
| 3.04 **Statutory fees** | Not applicable. |
| 3.05 **Prospective quarterly fees** | Not applicable. |

## Article 4: Treatment of Claims and Interests Under the Plan

4.01 **Claims and interests shall be treated as follows under this Plan:**

| Class | Impairment | Treatment |
|---|---|---|
| Class 1 - **Priority claims** (excluding those in Article 3) | ☒ Impaired<br>☐ Unimpaired | Class 1 consists of the claims entitled to priority under § 507(a)(7) of the Code (the "Priority Deposit Claims"), which are impaired.<br><br>The Debtor shall pay in full all allowed Priority Deposit Claims in quarterly installments starting in February 2025 and ending in May 2026. As set forth in the Projections, the first three quarterly payments shall be in the amount of $30,000, followed by two quarterly payments of $45,000 and a final quarterly payment in the amount of $13,213. Holders of allowed Class 1 claims will receive a pro rata distribution of each Class 1 quarterly payment and will be paid in full following completion by the Debtor of all Class 1 quarterly payments. The treatment and consideration to be received by |

| | | |
|---|---|---|
| | | holders of Class 1 claims shall be in full settlement, satisfaction, release and discharge of their respective Claims. |
| Class 2 – **Secured claims** | ☒ Impaired<br>☐ Unimpaired | Class 2A consists of the allowed secured claim of Dime Bank, which is impaired.  Dime Bank has a valid and properly recorded first-priority mortgage lien on the Debtor's Properties, as well a disputed security interest in all assets of the Debtor.  The Debtor will pay Dime Bank monthly payments of $12,265.30 on account of principal, interest and a real estate tax escrow during the length of the Plan.  By no later than the end of the Plan term, the Debtor shall have the option to either (1) cure all of the contractual arrearages owing to Dime Bank under the Dime Bank loan documents, at which point, the Debtor will be current in all loan payments to Dime Bank, and the loan with Dime Bank will be deemed reinstated; or (2) the outstanding indebtedness owing to Dime Bank shall be paid in full.  The Debtor may pay the outstanding indebtedness through any mechanism it chooses, including through an investment, sale, finance, or refinance transaction, any or all of which the Debtor is authorized to do without the need for Bankruptcy Court approval.  If the Debtor's preferred method of retiring the Dime Bank indebtedness is through a refinance transaction, the Debtor shall be authorized to perform any such transaction, including granting liens to the new lender having the same priority as the liens of Dime Bank, and any lienholder with a lien subordinate to Dime Bank's lien shall cooperate in subordinating any such lien to enable a refinance lender to assume a lien position with the same extent and priority as Dime Bank's liens.  To the extent of its allowed secured claim, Dime Bank shall retain its lien on the Debtor's property to the same extent, priority, and validity as it held as on the Petition Date until said allowed secured claim is paid in full.<br><br>Class 2B consists of the allowed secured claim of Kubota, which is impaired.  Kubota has a valid and perfected first-priority lien on a tractor and related parts thereto.  The Debtor will pay Kubota its regular monthly loan payments current post-petition.  To the extent of its allowed secured claim, Kubota shall retain its lien on the Debtor's property to the same extent, priority, and validity as it held as on the Petition Date until said allowed secured claim is paid in full.<br><br>Class 2C consists of the allowed secured claim of Malcolm Road Associates Limited Partnership ("Malcolm Road"), which is impaired.  Malcolm Road has a valid and properly recorded mortgage lien on the Debtor's Properties.  The |

| | | | |
|---|---|---|---|
| | | | Debtor will pay Malcolm Road monthly payments of $5,000, which shall be applied first to accrued and unpaid interest and then to principal.  By no later than the end of the Plan term, the Debtor shall have the option to either (1) cure all of the contractual arrearages owing to Malcolm Road under the Malcolm Road loan documents, at which point, the Debtor will be current in all loan payments to Malcolm Road, and the loan with Malcolm Road will be deemed reinstated; or (2) the outstanding indebtedness owing to Malcolm Road shall be paid in full.  The Debtor may pay the outstanding indebtedness through any mechanism it chooses, including through an investment, sale, finance, or refinance transaction, any or all of which the Debtor is authorized to do without the need for Bankruptcy Court approval.  If the Debtor's preferred method of retiring the Malcolm Road indebtedness is through a refinance transaction, the Debtor shall be authorized to perform any such transaction, including granting liens to the new lender having the same priority as the liens of Malcolm Road.  To the extent of its allowed secured claim, Malcolm Road shall retain its lien on the Debtor's property to the same extent, priority, and validity as it held as on the Petition Date until said allowed secured claim is paid in full. |
| Class 3 – **Non-priority unsecured creditors** | X<br>☐ | Impaired<br>Unimpaired | Class 3 consists of all non-priority unsecured claims allowed under § 502 of the Code, which are impaired.<br><br>Holders of allowed non-priority unsecured claims shall be paid pro rata from the Debtor's disposable income during the Plan, as set forth in the Projections.  Based on the Projections and payments that are made to all claims with a higher priority to that of non-priority unsecured claims (including Administrative Expense Claims, Priority Tax Claims and Priority Deposit Claims), the first distribution to Class 3 claimants shall occur in November 2026, with subsequent distributions to occur every six months thereafter.  A final distribution will occur upon the conclusion of the Plan term in April 2029.  The payments to be made to Class 3 total $997,032, which is equivalent to about 29% of each allowed Class 3 claim based upon the amount of scheduled claims in the aggregate amount of $3,435,929.77.  The treatment and consideration to be received by holders of Class 3 claims shall be in full settlement, satisfaction, release and discharge of their respective claims. |
| Class 4 - **Equity security holder of the Debtor** | ☐<br>X | Impaired<br>Unimpaired | Equity interests in the Debtor will retain those interests. |

## Article 5: Allowance and Disallowance of Claims

| | | |
|---|---|---|
| 5.01 | **Disputed claim** | A disputed claim is a claim that has not been allowed or disallowed by a final non-appealable order, and as to which either:<br><br>(i)     a proof of claim has been filed or deemed filed, and the Debtor or another party in interest has filed an objection; or<br><br>(ii)    no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated. |
| 5.02 | **Delay of distribution on a disputed claim** | No distribution will be made on account of a disputed claim unless such claim is allowed by a final non-appealable order.  The Debtor shall have up to 30 days after the order confirming the Plan becomes final and non-appealable to file objections to claims, and the failure to file a timely objection to any such claim shall result in the deemed allowance of the claim. |
| 5.03 | **Settlement of disputed claim** | The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Rule 9019 of the Federal Rules of Bankruptcy Procedure. |

## Article 6: Provisions for Executory Contracts and Unexpired Leases

| | | |
|---|---|---|
| 6.01 | **Assumed executory contracts and unexpired leases** | (a) The Debtor assumes the following executory contracts and unexpired leases as of the Effective Date: the lease of a dishwasher lease from Ecolab, as set forth on the Debtor's Schedule G.<br><br>(b) Except for executory contracts and unexpired leases that have been assumed before the Effective Date or under section 6.01(a) of this Plan, or that are the subject of a pending motion to assume, the Debtor will conclusively be deemed to have rejected all executory contracts and unexpired leases as of the Effective Date.<br><br>A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than 30 days after the date of the order confirming this Plan. |

## Article 7: Means for Implementation of the Plan

The Plan will be implemented as more fully set forth on the Debtor's Projections, which are attached as Exhibit B.

The Plan sets forth a payment period that begins on the Effective Date and concludes on April 30, 2029, which is five years from the Petition (the "Plan Period"). Bankruptcy Code section 1191(c)(2)(A) sets three years as the default plan period; however, the Debtor is proposing a lengthier plan period in order to pay its Priority Tax Claims and other creditors over the five-year period (measured from the Petition Date) as permitted by 11 U.S.C. § 1129(a)(9)(C)(ii). This longer period will reduce the monthly distributions required to be made to the Taxing Authorities, thereby enabling the Debtor to pay its necessary operating expenses as well as secured and priority creditors as more fully set forth in this Plan, all of which will ultimately enable the Debtor to pay non-priority unsecured creditors a greater distribution than they would receive under a standard three-year plan period.

The Debtor will fund its payments under the Plan from its projected disposable income received in the Plan Period. As shown by the Projections, the Debtor anticipates having approximately $186,440 in cash on the Effective Date, which will function as a liquidity cushion during the case and is not included as disposable income received in the Plan Period under 11 U.S.C. § 1191(c)(2)(A). At the end of the Plan Period, based upon the Projections, the Debtor's final distribution to non-priority unsecured creditors in Class 3 will reduce its cash balance back down to the amount of cash held on the Effective Date. Accordingly, based upon the Projections, the Debtor will be devoting all of its disposable income throughout the Plan Period to payments under the Plan.

Generally, the Projections consist of a template starting with expected revenues less normal operating expenses less payments required under the Plan.

Revenues numbers for 2024 are based largely upon the number of weekly campers, which are about 100. After 2024 and through the balance of the Plan Period, the Debtor assumes an increase from 100 to 105 campers. Revenues from "Retreats" refers to events held any time other than the camp season and are expected to create revenue of approximately $70,000 in aggregate each year.

Payments under the Plan or "Bankruptcy Payments" are comprised of the following:

"Debt Service (Dime)" consists of monthly loan payments made to Dime Bank based upon historical principal, interest and real estate tax escrow payments payable to Dime Bank. From this amount, Dime Bank must use the real estate tax escrow to pay the Debtor's real estate taxes. Dime Bank's treatment under the Plan is set forth in Section 4.01 (Class 2A).

"Real Estate Tax Arrearages" consist of current real estate taxes that accrued when Dime Bank was no longer accepting monthly loan payments from and after April 2024. Due to this, the Debtor anticipates that there will be a seven-month shortfall in real estate taxes, which the Debtor shall remit to the applicable Taxing Authority or contribute to the Dime Bank real estate tax escrow in six installments beginning on the Effective Date.

"Pre-Petition Taxes" consist of the allowed claims of the Taxing Authorities, whose treatment is set forth in Section 3.03 of the Plan. The Priority Tax Claims have been amortized over the Plan Period with interest at an annual rate of 8% to provide for full payment of all such claims within five years of the Petition Date, as permitted by 11 U.S.C. § 1129(a)(9)(C)(ii).

"Priority Deposit Payments" consist of the allowed Priority Deposit Claims, whose treatment is set forth in Section 4.01 (Class 1) of the Plan. The Debtor projects that the aggregate payments to holders of Priority Deposit Claims will be sufficient to pay in full all allowed Priority Deposit Claims by May 2026.

"Sub-V Trustee Fees" consist of the allowed claim of the Subchapter V Trustee in the anticipated amount of approximately $6,000. According to the Projections, this claim will be paid in full within two months of the Plan going effective.

"Pre-Confirmation Legal" consists of the Debtor's court-employed professionals in the anticipated amount of approximately $60,000. It is anticipated that these claims will be paid in full within twelve months of the Plan going effective.

"Malcolm Road Associates" consists of monthly loan payments made to Malcolm Road in an agreed monthly amount of $5,000. Malcolm Road's treatment under the Plan is set forth in Section 4.01 (Class 2C).

Finally, "Unsecured Distribution" consists of payments to non-priority unsecured creditors, whose treatment is set forth in Section 4.01 (Class 3) of the Plan. According to the Projections, non-priority unsecured creditors will receive in the aggregate the equivalent of approximately 29% of their allowed claim.

Any sale of the Debtor's property after the entry of the Order confirming this Plan shall be exempt from transfer tax pursuant to Code Section 1146.

The Debtor shall have the exclusive right, but shall be under no obligation, to pursue causes of action allowed under applicable law or under the Bankruptcy Code ("Causes of Action"). Although the Debtor is not aware of any Causes of Action, if they do exist, the Debtor shall prosecute them diligently so as to conclude such actions as soon as practicable, with the proceeds therefrom being included in their Disposable Income and paid to creditors in accordance with this Plan.

From and after the Effective Date, the Debtor may, in the ordinary course and without the necessity of any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professional persons thereafter incurred, including, without limitation, those fees and expenses incurred in connection with the implementation and consummation of the Plan.

## Article 8: General Provisions

| | |
|---|---|
| 8.01 **Definitions and rules of construction** | Capitalized terms shall have the meaning ascribed to them in this Plan. The definitions and rules of construction set forth in §§ 101 and 102 of the Code shall apply when terms defined or construed in the Code are used in this Plan. |
| 8.02 **Effective date** | The "Effective Date" of this Plan is the later of (1) November 1, 2024, or (2) the first business day that is at least 15 days after the entry of the confirmation order. If, however, a stay of the confirmation order is in effect on either of those dates, the Effective Date will be the first business day after the date on which the stay expires or is otherwise terminated. |
| 8.03 **Severability** | If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan. |

| | | |
|---|---|---|
| 8.04 **Binding effect** | | The rights and obligations of any entity named or referred to in this Plan will be binding upon, and will inure to the benefit of the successors or assigns of such entity. |
| 8.05 **Captions** | | The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan. |
| 8.06 **Controlling effect** | | Unless a rule of law or procedure is supplied by federal law (including the Code or the Federal Rules of Bankruptcy Procedure), the laws of the Commonwealth of Pennsylvania govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwise provided in this Plan. |
| 8.07 **Corporate governance** | | Not applicable. |
| 8.08 **Retention of Jurisdiction** | | The Court shall retain jurisdiction of this Case after the Confirmation Date for the following purposes: |

a. To take any action with respect to the subordination, allowance, disallowance, validity, perfection, enforcement or avoidance of Claims and liens, including, determination of objections to the allowance of claims and amendments to schedules;

b. To classify the Claim of any Claimant and to re-examine Claims which have been allowed for purposes of voting, and to determine such objections as may be filed to Claim;

c. To determine any and all disputes arising under or the Plan;

d. To determine any and all applications for allowance of compensation and reimbursement of expenses herein;

e. To determine any applications for rejection of executory contracts and unexpired leases and to determine the amount of any Claims resulting from the rejection thereof or from the rejection of executory contracts or unexpired leases pursuant to the Plan;

f. To determine any and all applications, adversary proceedings and contested and litigated matters pending in the Case as of the Confirmation Date or filed within one hundred eighty days thereafter;

g. To hear, determine and enforce any Code-created Causes of Action and to authorize prosecution of same in such other courts as may be required by law;

h. To modify any provision of the Plan to the full extent permitted by the Code;

i. To correct any defect, cure any omission or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purposes, intent and effect of the Plan;

j. To determine such other matters as may be provided for in the Confirmation Order or as may be authorized under provision of the Code or otherwise deemed appropriate to accomplish the Plan's intent and purpose;

k. To grant extensions of any deadline set herein;

l.  To enforce all discharge provisions under the Plan;

m.  To enter any order, including injunctions, necessary to enforce the terms of the Plan, and the rights and power of the Debtor under the Code, this Plan and as the Court may deem necessary; and

n.  To enter a Final Order closing this Case.

## Article 9: Discharge

If the Debtor's Plan is confirmed under § 1191(a), on the effective date of the Plan, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in § 1141(d)(1)(A) of the Code, except that the Debtor will not be discharged of any debt:

a.  imposed by this Plan; or
b.  to the extent provided in § 1141(d)(2).

If the Debtor's Plan is confirmed under § 1191(b), confirmation of this Plan does not discharge any debt provided for in this Plan until the court grants a discharge on completion of all payments due within the first 3 years of this Plan, or as otherwise provided in § 1192 of the Code. The Debtor will not be discharged from any debt:

a.  on which the last payment is due after the first 3 years of the plan, or as otherwise provided in § 1192; or
b.  excepted from discharge under § 523(a) of the Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

## Article 10: Other Provisions

1. The Debtor and the Subchapter V Trustee (the "Trustee") have agreed that the Trustee's services shall terminate once the Debtor has filed a notice of the Effective Date and confirmation that all payments required on the Effective Date have occurred. For the avoidance of doubt, the Trustee shall file a Report of No Distribution with this Court upon termination of the Trustee's services, upon which the Trustee shall be discharged from all further duties as Trustee in the case.

2. The Debtor shall be responsible for disbursing all payments required pursuant to the Plan over the entire duration of the Plan. The Debtor shall file post-confirmation distribution reports as required under Local Rule 3021-1.

Respectfully submitted,

CAMP RIM ROCK, LLC

By: /s/ *Joseph Greitzer*
Joseph Greitzer
Sole Member


SMITH KANE HOLMAN, LLC

By: /s/ *Nicholas M. Engel*
Nicholas M. Engel, Esquire
David B. Smith, Esquire
112 Moores Road, Suite 300
Malvern, PA 19355
Tel: (610) 407-7216
Fax: (610) 407-7218
nengel@skhlaw.com
*Counsel to the Debtor*